IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

**ALONZO GILLIAM III**                                                                                       **PLAINTIFF**
**ADC #98194**

v.                                  No. 2:17-cv-00021 KGB-PSH

**ARIC W. SIMMONS, CAPTOLA M. CLINKSCALE,**
**BRETT C. BUTLER, GERALDINE CAMPBELL,**
**TAMMY KIMBLE, AMY ROWLAND, and**
**TEKELIA WILLIAMS**                                                                                       **DEFENDANTS**

## FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following Recommendation has been sent to United States District Judge Kristine G. Baker. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

#### I. Introduction

Plaintiff Alonzo Gilliam III, an inmate at the Arkansas Department of Correction's ("ADC") East Arkansas Regional Unit, filed a complaint pursuant to 42 U.S.C. § 1983 on February 9, 2017, alleging that he was denied adequate medical care for complaints of abdominal pain and urinary and rectal bleeding. *See* Doc. No. 9. Gilliam sues Aric Simmons, Captola M. Clinkscale, Dr. Brett C. Butler, Geraldine Campbell, Tammy Kimble, Amy

Rowland, and Tekelia Williams (the "Defendants") in their individual capacities. *Id.* at 2. He seeks compensatory and punitive damages. *Id.* at 17.

The Court previously determined that Gilliam had exhausted his administrative remedies with respect to the following claims:

1)  claims against Simmons, an Advanced Practice Registered Nurse, based on Gilliam's encounters with Simmons on April 14, 2015, May 26, 2015, June 30, 2015, August 10, 2015, and October 5, 2015; the delay in treatment prior to Gilliam's diagnosis in September 2015 of an e. coli infection and blood in his urine; and corrective inaction;

2)  claims against Dr. Butler based on a May 16, 2015 bleeding incident and corrective inaction.

3)  claims against Clinkscale, a nurse, based on the May 16, 2015 bleeding incident and corrective inaction;

4)  claims against Williams, a nurse, based on an August 17, 2015 bleeding incident; and

5)  claims against Campbell, an Advanced Practice Registered Nurse, Kimble, the Director of Nursing at the relevant times (see Doc. No. 91-2), and Rowland[1] for corrective inaction.

Doc. Nos. 90 & 101. Gilliam testified in a deposition that he had no claim based on his encounter with Simmons on June 30, 2015, and that he agreed to dismiss Campbell as a party to his lawsuit. Doc. No. 117-4 at 5 & 11-12.

---

[1] It is unclear what Rowland's job was at EARU. Gilliam states she was the Director of Nursing or Assistant Director of Nursing.

Before the Court are a motion for summary judgment and related pleadings filed by the Defendants.  *See* Doc. Nos. 115-117.  Gilliam filed a response and a statement of disputed facts, but he did not specifically controvert the facts set forth in Defendants' statement of uncontested facts, Doc. No. 117.  Accordingly, those facts are deemed admitted.  *See* Local Rule 56.1(c).  The Defendants' statement of uncontested facts, and the other pleadings and exhibits in the record, establish that the material facts are not in dispute and that the Defendants are entitled to judgment as a matter of law.

## II.  Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986).  When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party.  *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).  The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial.  *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).  The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.  *Id.* (citations omitted).  An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". Fed. R. Civ. P. 56(c)(1)(A).  A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse

3

party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III. Undisputed Facts

The following undisputed facts are taken from those submitted by the Defendants which are supported by the following documentary evidence: Gilliam's medical records from January 2015 through January 2016 (Doc. No. 117-1); Declaration of Aric Simmons (Doc. No. 117-2); Declaration of Dr. Brett C. Butler (Doc. No. 117-3); a portion of Gilliam's deposition testimony transcript (Doc. No. 117-4); and a printout of Tekelia Williams' timesheet for August 17, 2015 (Doc. No. 117-5).

Gilliam alleges that he was denied adequate medical care for complaints of abdominal pain and urinary and rectal bleeding during 2015 while he was incarcerated at the ADC's East Arkansas Regional Unit. Doc. No. 9. On January 7, 2015, Gilliam had a consultation with a urologist at the University of Arkansas for Medical Sciences (UAMS). Doc. No. 117-1 at 1-4. He complained of an enlarged prostate, difficulty urinating on occasion, rectal discharge, and constipation. *Id.* The urologist found that Gilliam had a normal uncircumcised penis, normal testes, no hernias, benign rectal tissue, and no discharge. *Id.*

On April 14, 2015, Gilliam saw Simmons, an Advanced Practice Registered Nurse (APRN),[2] in relation to a sick call request he submitted regarding ear pain. Doc. No. 117-1 at 9 & 13; Doc. No. 117-2 at 2. At that encounter, Gilliam also wanted to discuss his skin, his diet, and medication renewals. Doc. No. 117-1 at 9 & 13; Doc. No. 117-2 at 2. Gilliam's sick call requests before the April 14 encounter related to his ear and prescription lotions for burns. Doc. No. 117-1 at 7-8 & 10. Gilliam did not place a sick call request relating to his penis, abdominal pain, or blood in his urine or stool in 2015 before the April 14 encounter, and the April 14 exam record does not indicate that Gilliam complained of such problems during that encounter. Doc. No. 117-1 at 13; Doc. No. 117-2 at 2.

Gilliam's first sick call requests in 2015 relating to his prostate or colon were signed by Gilliam on April 21, received in medical on April 23, and triaged on April 27, 2015. Doc. No. 117-1 at 14-15. He submitted two sick call requests: one asking to be tested for prostate and colon cancer because it ran in his family, and the other complaining of blood in his bowel movements and stomach pain. *Id.* The first sick call request Gilliam submitted relating to his penis (following his January urology evaluation) was dated April 29, 2015. *Id.* at 16. That sick call request was received in the infirmary on April 30 and triaged on May 3, 2015. *Id.* In that request, Gilliam complained of rectal bleeding and painful bowel movements, stomach pain, blood in his urine, and a swollen penis. *Id.* Gilliam submitted another sick call request on April 30, complaining about

---

[2] According to Simmons' affidavit, he is a Certified Family Nurse Practitioner duly licensed by the State of Arkansas. *Id.* An APRN is considered a mid-level provider within the ADC. *Id.* Simmons worked in a collaborative agreement with Dr. Butler and other CCS physicians to provide medical care akin to that which a physician provides. Doc. No. 117-3 at 1. As a nurse practitioner, Simmons does not triage sick call requests or schedule nursing and provider encounters. Doc. No. 117-2 at 3; Doc. No. 117-3 at 2.

5

several issues and requesting a prostate and colon cancer screening. *Id.* at 17. A nurse saw Gilliam for sick call on May 3, 2015, and referred him to a provider. *Id.* at 18.

Gilliam had an encounter with APRN Simmons on May 11, 2015, to address renewal of medications for back pain. *Id.* at 20. Gilliam also requested labs and testing (stool guaiac) for prostate and colon cancer screening due to a family history of colon cancer. *Id.* Simmons noted that Gilliam's last Prostate-Specific Antigen (PSA) test was .9, which is normal. *Id.* Simmons also noted that Gilliam declined a prostate exam, during which Simmons could have performed a stool guaiac test. *Id.* Simmons entered an order for a fecal occult blood test, *i.e.*, stool guaiac, as well as lab work. Doc. No. 117-1 at 20-21. The exam record does not reflect that Gilliam complained about a colon issue during the May 11 exam. *Id.*

Gilliam alleges that immediately after his May 11 exam, he wrote "a medical request and complaint seeking medical treatment and making a complaint against Dr. B.C. Butler and APNB A.W. Simmons for delays and denials in providing medical treatment." Doc. No. 9 at 6. Gilliam states that he addressed the document to Dr. Butler, Dr. Campbell, APN Simmons, Ms. Y. Key/Medical Grievance Staff, DON Amy Rowland, and ADON Tammy Kimble. *Id.* Gilliam alleges that they failed to respond to it or take corrective action. *Id.* Simmons and Dr. Butler deny that they received any handwritten complaint from Gilliam. Doc. No. 117-2 at 3; Doc. No. 117-3 at 2.

Gilliam was seen by nurse Clinkscale in the infirmary as a walk-in on May 16, 2015. Doc. No. 117-1 at 21. He made several complaints, including seeing blood in his urine, blood in his stool, and blood in his ear. *Id.* Clinkscale's notes state that Gilliam said he had right lower abdominal pain but he displayed no reactive response to indicate pain. *Id.* Clinkscale noted a moderate amount of blood in Gilliam's right ear, although he did not say he had pain related to

6

that ear. *Id.* Clinkscale obtained verbal orders from Dr. Butler to start on the antibiotics Ciprofloxacin (Cipro) and amoxicillin-clavulanate-potassium (Amo/Clav). Doc. No. 117-1 at 21-22. Dr. Butler was not otherwise involved in the May 16 encounter or immediate follow-up care. Doc. No. 117-3 at 1-2. Clinkscale put Gilliam on the provider list. Doc. No. 117-1 at 21-22. According to Simmons and Dr. Butler, Gilliam was properly prescribed a broad-spectrum antibiotic that would treat both an ear infection and a urinary tract infection (UTI). Doc. No. 117-2 at 4; Doc. No. 117-3 at 2. According to Gilliam's medical records, he received six of his seven dosages of Cipro and was a no-show for the missed pill call. Doc. No. 117-1 at 23-24. Gilliam only received five of 20 dosages of the Amo/Clav, and it is not clear why he did not receive the full dosage. *Id.*

The lab work ordered by Simmons was completed on May 18, 2015. Doc. No. 117-1 at 25-28. Other than a low thyroid stimulating hormone, Gilliam's blood work was normal. *Id.*; Doc. No. 117-2 at 4. Gilliam was previously diagnosed with hyperthyroidism. *See* Doc. No. 117-1 at 12. According to Simmons, Gilliam's bloodwork would not have been normal if he was bleeding as much as he claimed. Doc. No. 117-2 at 5.

Gilliam signed a sick call May 19, 2015, which was triaged May 21 and referred to a provider on May 23. *Id.* at 29. He complained of multiple issues, including bleeding on May 16 as noted by Clinkscale. *Id.* He was seen by a nurse on May 24, 2015, but he was noted as being argumentative and non-cooperative. *Id.* at 30. The nurse referred him to a provider. *Id.*

Simmons saw Gilliam on May 26, 2015. *Id.* at 31; Doc. No. 117-2 at 4. He complained of bleeding from his right ear, penis, and rectum. *Id.* Simmons noted that his tympanic membrane was ruptured with bloody drainage in his ear canal. *Id.* Simmons noted his penis had some edema and dried blood, but no palpable nodules. *Id.* Simmons noted it was difficult to retract the foreskin

of the penis, but that is common in an uncircumcised male. Doc. No. 117-1 at 31; Doc. No. 117-2 at 5. Simmons also noted that Gilliam had an enlarged soft prostate and no palpable masses in his rectum. Doc. No. 117-1 at 31; Doc. No. 117-2 at 4. His abdomen was soft and tender to the upper right quadrant. *Id.* Simmons found no blood during Gilliam's rectal exam on May 26. Doc. No. 117-2 at 5. Simmons prescribed steroids as well as Cipro and Amo/Clav for 21 days (both of which treat bacterial urinary tract infections), ordered a urinalysis with microscopic examination, and made a note for staff to obtain the occult stool test that he had ordered on May 11. Doc. No. 117-1 at 31-32; Doc. No. 117-2 at 4. Simmons also ordered prednisone for the inflammation and an x-ray of Gilliam's kidneys, ureter, and bladder (KUB). Doc. No. 117-1 at 31-32; Doc. No. 117-2 at 4-5. Simmons intended Gilliam to follow up after testing to consider a colonoscopy. Doc. No. 117-2 at 5. Simmons noted "F/U in 2 weeks to reevaulate bleeding. May consider colonscopy." Doc. No. 117-1 at 32; Doc. No. 117-2 at 4-5.

The urinalysis with microscopic examination taken May 29 revealed that Gilliam had a urinary tract infection (UTI). Doc. No. 117-1 at 33-35; Doc. No. 117-2 at 5. Occult blood was found in Gilliam's urine; blood in the urine is a common condition known as hematuria. *Id.* A UTI is susceptible to both antibiotics prescribed on May 26. Doc. No. 117-2 at 5. The KUB x-ray did not reveal anything which could cause abdominal pain or symptoms. Doc. No. 117-1 at 36-37; Doc. No. 117-2 at 5. Dr. Butler saw Gilliam for follow-up for hematuria on June 9, 2015. Doc. No. 117-1 at 38.

Gilliam submitted a request to be seen on June 15, 2015, which was triaged on June 16. Doc. No. 117-1 at 39. He requested to be seen for several issues, including pain with bowel movements. Doc. No. 117-1 at 39. Gilliam next submitted a sick call request dated June 21, which was triaged June 22, informing staff that he had not received his urine test or stool test. Doc. No.

117-1 at 40. He was seen by a nurse in sick call on June 25, 2015, and it was noted that he was requesting labs that had been previously ordered. Doc. No. 117-1 at 41; Doc. No. 117-2 at 6. There is no notation that the evaluating nurse checked on the status of the labs that Simmons ordered on May 11 and May 26. *Id.* Simmons does not know why Gilliam did not receive the stool guaiac cards for his fecal occult blood test in May. *Id.*

Simmons saw Gilliam at sick call on June 30, 2015. Doc. No. 117-1 at 42; Doc. No. 117-2 at 6. Gilliam complained that he had bloody stool and continued penile edema. Doc. No. 117-1 at 42. Simmons reviewed the last urinalysis that had been taken in May and prescribed a second antibiotic that treats a bacterial UTI, doxycycline monohydrate. *Id.* Simmons believed the May antibiotics likely killed the bacteria but wanted to be aggressive to ensure resolution rather than wait on another urinalysis. Doc. No. 117-2 at 6. The doxycycline ordered by Simmons could treat both the prostate as well as an ear infection. Doc. No. 117-2 at 6. Simmons was frustrated that the fecal occult blood test still had not been completed when he had originally ordered it seven weeks prior, so he reordered it. Doc. No. 117-1 at 42; Doc. No. 117-2 at 6. Simmons also ordered another urology consult and another urinalysis with microscopic examination. Doc. No. 117-1 at 42-43; Doc. No. 117-2 at 6.

Gilliam's lab work was completed on July 7, 2015. Doc. No. 117-1 at 44. The urinalysis was normal, and there was no evidence of UTI at that time, indicating that the antibiotics prescribed in May and/or June resolved his urinary tract infection. Doc. No. 117-2 at 6.

Gilliam submitted two sick calls, one July 19 and one July 20, complaining about right side pain with bowel movements and constipation. Doc. No. 117-1 at 46-47. They were both triaged on July 24. *Id.* Gilliam was seen by a nurse for both sick call complaints on July 26, 2015. *Id.* at 48. There was no pain noted upon physical examination of his abdomen. *Id.* Gilliam complained

it was difficult to complete a bowel movement, and the nurse prescribed Colace, a stool softener. *Id.*

On August 4, 2015, Gilliam was seen at UAMS for a urology consult. *Id.* at 49. The UAMS urologist determined that Gilliam had a slightly enlarged prostate and a normal uncircumcised penis with no findings of irregularity. *Id.* He was released to return in six months. *Id.*

Gilliam submitted a sick call letter dated August 7, 2015, requesting pain medication for his back condition. Doc. No. 117-1 at 51-52. At the end of his letter, he requested to be taken off Tylenol because it constipated him. *Id.* (Dr. Butler had ordered acetaminophen during chronic care earlier in May. Doc. No. 117-1 at 32.)

Simmons saw Gilliam on August 10, 2015, for a sick call complaint. *Id.* at 53. Gilliam had several complaints, including that Tylenol (or acetaminophen) caused him constipation. *Id.* Simmons continued Gilliam's Tylenol prescription because it was something that he could take as needed, but was not required to take. *Id.*; Doc. No. 117-2 at 7. Simmons also continued the order for Colace for Gilliam's complaint of constipation. *Id.*

Gilliam testified that nurse Williams was called to his cell on August 17, 2015, after he complained about specks of blood in his urine. Doc. No. 117-4 at 8-10. He stated that she brought him a urine cup, but he had just used the restroom and was unable to produce a sample. *Id.* According to Gilliam, Williams later told Gilliam she was going to make an appointment for him to see a provider, Campbell, but she did not do so. *Id.* Gilliam is critical of Williams because she did not log her interaction with him, which was a failure to follow protocol. *Id.* Instead, a different nurse, Davis, saw him on August 18, 2015, and referred him to the provider. *Id.* Williams worked from 8:14 p.m. August 17 to 7:36 a.m. August 18, 2015. Doc. No. 117-5.

10

Simmons and Dr. Butler understand that Gilliam complained about not being seen by Campbell after he saw nurse Williams on August 18 and informed her that he had blood in his urine. Doc. No. 117-2 at 9; Doc. No. 117-3 at 2-3. Although Williams did not enter a note about her interaction with Gilliam, Simmons and Dr. Butler understand that Gilliam was placed on the providers list, and that he complained of the delay from August 18 to him being seen by a provider, which took place on September 3. *Id.*

Gilliam finally received three stool guaiac cards in August. Doc. No. 117-2 at 7. He used the cards and turned them in to medical. *Id.* On August 19, 2019, his fecal occult blood tests were noted to be positive, and Dr. Butler was notified. Doc. No. 117-1 at 54; Doc. No. 117-2 at 7. APRN Drummond requested a colonoscopy consult on August 20, 2015. Doc. No. 117-1 at 55-56; Doc. No. 117-2 at 7.

Gilliam was a walk-in to the infirmary on August 31, 2015. Doc. No. 117-1 at 57. He complained about blood in his stool and was referred to the provider. *Id.* On September 3, 2015, he was seen by Drummond for his complaints of blood in his urine and other issues. *Id.* at 58-59. He was diagnosed with hematuria and blood in the stool. *Id.* Drummond ordered additional lab work and x-rays. *Id.* A KUB x-ray taken on September 6, 2015 did not show anything relevant to his complaints or condition. *Id.* at 60. Blood tests performed on September 11 were normal and revealed that Gilliam's PSA was .9, which is within the normal range for his prostate. Doc. No. 117-1 at 65; Doc. No. 117-2 at 8.

Gilliam submitted a sick call September 9 requesting to see a doctor about his stomach, bowel movements, and medications. Doc. No. 117-1 at 61. He was seen in sick call on September 11, and complained that Tylenol stopped him up and that the stool softeners hurt his stomach. *Id.* at 62. He was referred to the provider. *Id.*

Urinalysis completed on September 15, 2015, indicated that Gilliam had another UTI, this time with growth. Doc. No. 117-1 at 67. The bacterial organism was identified as enterococcus. *Id*. Drummond reviewed the lab result on September 24 and recommended follow-up. *Id.* at 69.

Meanwhile, prior to Simmons' knowledge of the urinalysis results, Simmons saw Gilliam on September 21, 2015. Doc. No. 117-1 at 70; Doc. No. 117-2 at 8. Simmons noted that Gilliam continued to have side effects with Tylenol and Colace; therefore, Simmons discontinued both and added salsalate for pain control. *Id*. Simmons also prescribed Cipro 500mg twice a day for 14 days for reported hematuria. *Id.* According to Simmons, a standard dose of Cipro for a UTI is 250 mg every 12 hours and the higher dose of Cipro he prescribed would be satisfactory to kill the enterococcus bacteria. Doc. No. 117-2 at 8. Simmons also ordered another urinalysis which was collected the next day with abnormal results. *Id.*; Doc. No. 117-1 at 70-71.

A gastroenterologist examined Gilliam on September 28, 2015. Doc. No. 117-1 at 74. He made a recommendation to schedule a colonoscopy, and Dr. Butler prepared a consult seeking approval for the procedure on September 29, 2015. *Id*.

On October 5, 2015, Simmons saw Gilliam again for follow-up of his urinalysis results which revealed the enterococcus bacteria. *Id.* at 76. Gilliam reported continued burning with voiding; therefore, Simmons prescribed levofloxacin. *Id.* While the Cipro Gilliam was taking should have killed the bacteria by then, Simmons decided to treat Gilliam aggressively and prescribed the stronger antibiotic. Doc. No. 117-2 at 8-9. Simmons also ordered additional lab work. Doc. No. 117-1 at 76; Doc. No. 117-2 at 9. A urine sample collected October 15, 2015, was normal and reflected no growth. Doc. No. 117-1 at 77; Doc. No. 117-2 at 9.

Gilliam had a colonoscopy on January 15, 2016. Doc. No. 117-1 at 78-79. Gilliam's colonoscopy revealed a single diminutive polyp and a few scattered diverticula, but it was

otherwise normal. *Id.* The polyp was determined to be benign, and the gastroenterologist did not recommend another colonoscopy for 10 years. *Id.* at 80. Simmons and Dr. Butler concluded that Gilliam did not have a colon issue requiring any particular treatment, and have opined that the three-month delay in Gilliam receiving his fecal occult/stool guaiac test had no effect on his health. Doc. No. 117-2 at 9; Doc. No. 117-3 at 2.

Gilliam did not have an infection of the colon. Doc. No. 117-2 at 9-10; Doc. No. 117-3 at 3. Gilliam did not have E. coli.[3] *Id.* Gilliam's blood work did not show evidence of bleeding as claimed by Gilliam, *i.e.*, no evidence of hemorrhaging. Doc. No. 117-1 at 26-28, 33, 54 & 65.

## IV. Analysis

Defendants argue they are entitled to qualified immunity with respect to Gilliam's claims because Gilliam cannot establish a constitutional violation. Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015). Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis

---

[3] Gilliam asserts that defendants previously admitted he had E. Coli. A grievance response signed by Tammy Kimble on November 13, 2015, stated that E. Coli had been found in Gilliam's urine. *See* Doc. No. 59-1 at 118. However, Gilliam's relevant medical records, including urinalysis results do not show that Gilliam ever tested positive for E. Coli.

should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In considering whether defendants are entitled to qualified immunity, the Court considers whether Gilliam has presented facts sufficient to show the violation of a constitutional right.

The Eighth Amendment's proscription of cruel and unusual punishment obligates prison officials to provide adequate medical care to inmates in their custody. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). To succeed with an inadequate medical care claim, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs. *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it. *Id.; see also Farmer v. Brennan,* 511 U.S. at 837; *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). Additionally, the Eighth Circuit has held that a "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). Finally, an inmate alleging that a delay in medical treatment constitutes deliberate indifference is required to "'place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment.'" *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)). If the inmate does not, he fails to raise a genuine issue of fact on an essential element of his claim, and summary judgment is appropriate. *Id.*

The undisputed evidence shows that Defendants were not deliberately indifferent to Gilliam's serious medical needs. Gilliam was treated for his complaints. Various tests, including urinalysis, blood work, and x-rays, were ordered and completed. Gilliam's lab results did not show

significant blood loss. He was prescribed antibiotics for both ear and urinary tract infections. He was seen by a urologist and a gastroenterologist. His constipation was treated with stool softeners, and Tylenol was ultimately discontinued and replaced with another pain reliever. Gilliam had a colonoscopy with normal results. Additionally, as described below, Defendants have shown that they were not deliberately indifferent to Gilliam's medical needs with respect to each specific exhausted claim made by Gilliam.

*APRN Simmons*

The record shows that Simmons adequately treated Gilliam on April 14, 2015, May 26, 2015, August 10, 2015, and October 5, 2015. Prior to Gilliam's encounter with Simmons on April 14, 2015, he had not requested to be seen for urinary or bowel issues. The exam record from April 14 shows that Simmons treated him for complaints he made at that visit, all of which were unrelated to urinary or bowel issues. On May 26, 2015, Simmons treated Gilliam for a ruptured ear drum and swollen penis. He prescribed an antibiotic for 21 days and ordered urinalysis. Simmons found no blood or palpable masses in Gilliam's rectum. Simmons made a note for staff to obtain Gilliam's stool test that he previously ordered on May 11. Simmons noted that he would follow up after two weeks to reevaluate bleeding and consider a colonoscopy. Gilliam was diagnosed with a UTI a few days after that exam, and Simmons prescribed more antibiotics on June 30 and requested a consultation with a urologist. The antibiotics prescribed were effective, and the UTI was resolved by July 7, 2015. Gilliam saw a urologist on August 4, 2015, who noted that Gilliam had a slightly enlarged prostrate. On August 10, Gilliam complained of constipation, and Simmons continued his prescription for a stool softener.

On October 5, 2015, Simmons treated Gilliam for another urinary tract infection. Simmons had previously treated Gilliam two weeks before and prescribed antibiotics at that time. On October 5, he prescribed a stronger antibiotic to aggressively treat the infection. Gilliam's next urinalysis on October 15 was normal.

Although there was a delay in stool testing between the time Simmons first ordered a fecal occult blood test on May 11, and the time it was completed in August, that delay does not establish that Simmons was deliberately indifferent to Gilliam's serious medical needs. In fact, Simmons was frustrated with the delay in obtaining the test as ordered; requested that staff obtain the stool test again on May 26; and then re-ordered the test on June 30. When Gilliam's stool tested positive for blood in August, Drummond referred him to a gastroenterologist. He underwent colonoscopy which revealed only a small benign polyp and scattered diverticula. The gastroenterologist recommended that Gilliam return in 10 years. Gilliam offers no evidence that Simmons intentionally delayed the stool test or that he was harmed by the delay. *See e.g., Corwin v. City of Independence, MO*, 829 F.3d 695 (2016) (summary judgment appropriate where pretrial detainee failed to produce verifying medical evidence showing a detrimental effect due to delay in treating fractured wrist). Simmons and Dr. Butler have opined that Gilliam was not harmed by any delay in seeing a provider more quickly. Gilliam has offered no expert testimony to refute their opinion.

The evidence does not support a finding that Simmons was deliberately indifferent to Gilliam's serious medical needs. Simmons is entitled to summary judgment on Gilliam's claims relating to the encounters on April 14, 2015, May 26, 2015, August 10, 2015, and October 5, 2015, as well as Gilliam's claim regarding an overall delay in treatment.

*Dr. Butler and Nurse Clinkscale*

Gilliam sues Dr. Butler and nurse Clinkscale based on his treatment on May 16, 2015, when he was seen by nurse Clinkscale in the infirmary as a walk-in. Dr. Butler's only involvement in that encounter was to provide verbal orders for antibiotics when Clinkscale called him. Gilliam complained of blood in his ear, urine, and stool. Clinksdale noted some blood in Gilliam's ear. Clinkscale's notes indicate Gilliam also complained of abdominal pain, although on examination, Gilliam displayed no reactive response to indicate pain. Clinkscale called Dr. Butler and obtained a verbal order for antibiotics. Dr. Butler and APRN Simmons have opined that Gilliam was properly prescribed a broad-spectrum antibiotic that would treat both an ear infection and a UTI. Clinksdale also placed Gilliam on the list to see a provider. Clinkscale evaluated Gilliam's complaints, examined him, and made contact with Dr. Butler to obtain treatment orders. She documented her encounter with Gilliam, and placed him on the provider list. There is no evidence in the record to suggest that Clinkscale was deliberately indifferent to Gilliam's serious medical need during the May 16, 2015 visit.

Similarly, there is no evidence in the record to suggest that Dr. Butler was deliberately indifferent to Gilliam's serious medical needs during the May 16, 2015 visit. He received a call and report from Clinkscale about Gilliam, and ordered antibiotics to treat him. Although Gilliam complains that Dr. Butler did not follow-up after prescribing antibiotics, the record shows that Gilliam received follow up care by a number of providers. For example, Gilliam was seen again on May 24 by a nurse, and on May 26 by Simmons. He told Simmons that the prescribed antibiotic had improved his condition but did not clear it. Simmons prescribed two additional antibiotics to treat the UTI, which ultimately cleared the infection. There is no evidence that

Gilliam did not receive follow up treatment, or that Dr. Butler was deliberately indifferent to Gilliam's serious medical needs on May 16 or at any later time.

Clinkscale and Dr. Butler should be awarded summary judgment on Gilliam's claims.

*Nurse Williams*

Gilliam sues Williams because she did not log her contact with him on August 17, 2015, after he reported seeing specks of blood in his urine. According to Gilliam, Williams came to his cell and brought a urine cup. He was unable to produce a sample. He states Williams said she was going to make an appointment for him to see a provider but she did not do so. Williams' failure to document her encounter with Gilliam may constitute a violation of prison policy. It is not, however, a constitutional violation. *See Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) (no § 1983 liability for violating prison policy). Additionally, the evidence shows that another nurse saw Gilliam on August 18 (Williams worked from 8:14 pm to 7:36 am August 17-18), and that nurse referred Gilliam to the provider. Gilliam suffered no significant delay in treatment as a result of Williams' actions. The evidence does not support a finding that Williams was deliberately indifferent to Gilliam's serious medical needs or that her failure to document her interaction with him resulted in any injury to him. Williams is entitled to summary judgment on this claim.

*Corrective Inaction Claims (Simmons, Butler, Clinkscale, Campbell, Kimble, and Rowland)*

Gilliam's corrective inaction claims should fail. To succeed on a corrective inaction claim, an inmate must prove that the defendant was personally involved in a constitutional violation or became aware of the constitutional violation and, with deliberate indifference, failed to take corrective action or tacitly authorized the offending acts. *See, e.g., Luckert v. Dodge*

18

*Cty.*, 684 F.3d 808, 817 (8th Cir. 2012); *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993). This claim is based in part on Gilliam's May 11 "medical request and complaint" against Dr. Butler and Simmons. He states the document was addressed to Dr. Butler, Simmons, Rowland, Kimble, and other individuals who are not defendants in this matter. He did not receive a response, and argues that a lack of response evidences deliberate indifference and failure to take corrective action. However, the record shows that Gilliam was treated by Simmons on the very day he wrote the complaint. Simmons ordered a stool test and lab work at that time. The record also indicates that Gilliam first complained of rectal bleeding and urinary issues on April 29, 2015, and he was seen by a nurse on May 3, 2015, who referred him to a provider for those issues. Accordingly, assuming Simmons, Butler, Rowland, and Kimble received the May 11 letter, they would have had no reason to take corrective action because Gilliam had received and was receiving treatment for his complaints. Additionally, because the record does not establish any constitutional violation regarding Gilliam's medical treatment after May 11, the Defendants would not have had any reason, assuming they knew about it, to take corrective action during his course of treatment. The Defendants are therefore entitled to summary judgment on Gilliam's corrective inaction claims.

## V. Conclusion

Gilliam made complaints and requests for medical treatment about the issues in this case at least eleven times between April and September 2015. He was seen, evaluated, and treated by the medical staff, including the defendants, at least 18 times during that period. He was also seen by a urologist and a gastroenterologist, who performed a colonoscopy. Lab tests were ordered at least 6 times. Medications, including antibiotics, were prescribed a number of times as well. These facts simply do not support a finding that the defendants were deliberately indifferent to Gilliam's

serious medical needs. Therefore, for the reasons stated herein, the Defendants are entitled to qualified immunity, and Gilliam's claims against them should be dismissed with prejudice. The undersigned recommends that the Defendants' motion for summary judgment (Doc. No. 115) be granted and Gilliam's claims be dismissed with prejudice.

    SO RECOMMENDED this 11th day of July, 2019.

_____
UNITED STATES MAGISTRATE JUDGE